Thank you, Judge Park, and may it please the Court, Neal Katyal for Citibank. I'd like to reserve three minutes for rebuttal. After Citibank mistakenly wired nearly a billion dollars of its own money, the District Court said it couldn't get that money back. It did so despite the general restitution rule that recipients of mistaken transfers— whether the debt needs to be due and payable, whether the accounts need to be credited before you get notice, whether the type of notice we're talking about is inquiry notice or new or should have known notice, and whether the facts—assuming that it's inquiry notice—whether these facts satisfy inquiry notice. It seems to me that each of those issues is really a question of policy, and the Vorms—Citibank Vorms case, in my view, doesn't supply clear answers to any of those questions, which leads me to think that we would largely be guessing if we—to the extent we answer those questions. And furthermore, our answer wouldn't be very informative to the world because the question is, what's the New York Court of Appeals' view on this? And it seems to me there are strong arguments why this should be a case. It's not something I very often favor, but it seems to me that there are arguments why this should be a case that we certify to the New York Court of Appeals to answer. So I'd like each of you in your arguments to address your position as to whether this Court ought to certify. Judge LaValle, you had me all the way 100 percent through until you said it was a matter of policy, so I thought you beautifully summarized our independent arguments. We'd only need to win one to get reversal. And we do agree with you that if there's any doubt about what Bank Vorms said, you've got to certify. That is, you know, the amici before you representing every corner of the industry, including even the LSTA, which represents defendants, as well as banks like Citibank, all agree that this would create a gaping hole in the law of restitution if you affirm the district court. So we agree at a minimum certification is necessary if you're at all tempted by anything that my friend on the other side said. However, we do think that with respect to these questions that are presented, I don't think actually certification is necessary. I'll walk you through. So question one, whether the debt has to be presently due. Bank Vorms at page 196 said, used the phrase, is entitled, the present tense, and Carlisle used similar words about indebtedness being due. So I don't think you even have to go to the policy rationales. We do think obviously they support us for the reasons our brief says. But we do think the language of Bank Vorms itself and the entire rationale behind it, which is all about people who have their debt presently due and that kind of expectation of finality one to plot. Your position, I'm sorry, but your position, I suppose, is that you should win on appeal. But if we disagree, we ought to certify. Again, beautifully said, Judge Sack. But we do think that, you know, there's a very strong argument against certification here because of the language of Bank Vorms, Carlisle itself, with respect to question one. With respect to question two, Judge Sack, the language in Bank Vorms is, and it quotes the restatement, saying that the defense requires, quote, a creditor of another who has received any benefit in discharge of the debt. That is just not provided here whatsoever. My friend would read out the words for value in that defense. And so we don't think it would be needed for that. And then with respect to constructive notice, Judge LaValle, your third point, I think there isn't really a serious debate about what New York law requires here. I think Judge Berman went through all the cases. And constructive notice and inquiry notice is a feature, you know, going all the way back to Brainerd Hotel and Lerner Hand's decision. And so the only question we have— Well, constructive notice comes in different flavors. Absolutely. We think whatever flavor it comes in, it will require inquiry notice under the precedents in New York. And once you get to inquiry notice, it's an easy fact-bound determination that here they didn't do that. There were six different red flags at issue here. I mean, on your first question, which you started to argue, the entitlement question, it is true that bank worms used the language is entitled. I guess that's part of the restatement language, is it? It's actually the language from bank worms itself is entitled, yes. But the reasoning of bank worms seemed to depend on bolstering the reliability to the world of bank transfers, which is something that would apply whether the debt was due in owing or simply a credit. I think the Court of Appeals said that was one rationale and the kind of expectations of finality. But, Judge LaValle, here's our most important point about that. You know, a restitution defense is basically like hitting rewind and returning the parties to before the mistaken transfer. And if you hit that rewind button in bank worms, it would be unfair because you have two people who had a completely—two innocent parties who had a claim to the money. So as between the two innocent parties, bank worms says, we're going to allocate it to the bank. Now, in this case, by contrast, if you hit rewind here, it's not unfair. The parties get returned to the position that they bargained for before in the agreement itself. So they get their money three years later, not as—which is the agreement that they signed, and they get interest payments in the interim. So that's the fundamental kind of first principles difference or policy difference between a situation which the debt is presently due and not. And I think you could certify, of course, Judge LaValle, but it's pretty telling. In more than 100 years, they can't give you a case that says the debt doesn't have to be presently due. The amici say there's $5.4 trillion of wire transfers every single day. And what happens is people give the money back when you have these mistaken transfers every time. That's what the LSTA brief, you know, says. They're not aware of a single case outside of this one in which they decided to keep the money. So, you know, I think you could certify, but the fact is the dog has embarked. In thousands and thousands—millions and trillions of wire transfers, we've never had a circumstance in which a court has blessed what they've done here, which is adopt a discharge for value defense when the debt is— Counsel, could you help me understand how the prepayment provision factors into the analysis here on that point, that notice is required in order to prepay the loan? What's the purpose of that? And assuming it's to protect the creditors, is it something that could have been waivable? So, Judge Park, we think the prepayment clause notice is very helpful for our point because it requires irrevocable notice three days before a transfer to Citi, and then Citi's got to promptly alert the lenders about it. Does that mean that if this was intentional, then it didn't comply with the prepayment option and they would have had to return it anyway? It would be at the discretion, of course, of the folks who got it. But the fact is the prepayment clause itself, you know, this is bargained-for language in the contract. It's always at the discretion, as the LSTA brief says, of the people who are lending it. At the discretion of what? It's always at the discretion of the people lending it. So here, you know, it would be Revlon. And it's never at the option of them to say, oh, the money is now ours because it arrived before. They could have tried to put that in the contract, but Judge Park, really the language of the agreement, this is at Joint Appendix page 1263, is, quote, if any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein. And that, of course, was not complied with, which is why it was not due and payable on the day, unlike faint worms in which the debt had been called. And they can't provide a single example of where when you have this kind of tight prepayment clause regime, Judge Park, that the money is still prepaid outside of that regime. We don't disagree. Prepayment is very common, absolutely. But it's always done at the discretion of the borrower and in compliance with the terms. As I understand it, the issue of that notice can be quite significant, potentially significant for the inquiry notice question because it turns on what the meaning of promptly is in the context. The borrower was required to give Citibank three days prior notice, and Citibank was required in turn to give the lenders prompt notice. And the issue or an issue is whether that prompt notice required that it be prior to effectuating the repayment. And the way the district court analyzed it, a prompt notice did not require, a prompt notice permitted Citibank to wait three days after having, to wait more than three days after receiving the notice to pay. But if prompt notice meant that the lenders needed to get it before the payment was made less than three days, then there was a problem of where was that notice that they had not received. So, Judge LaValle, it's certainly the case that that's one of the six different red flags that we isolate here. It's only one. But we do think it's significant, and Judge Berman made an erroneous legal conclusion about what prompt notice requires. The whole reason why, and this, I think, goes to Judge Park, your question about repayment, which I didn't fully answer. The whole reason you have irrevocable notice and then prompt notice from Citi to the lenders is so they can get their affairs in order, so that they can arrange for insurance for the cash coming in and all sorts of things like that. And that's why it's required to be irrevocable in the contract itself. And so when you couple that with the fact that there were no calculations, the calculation statements provided amounts that were 100 times less than the money they actually received, when you factor in the fact that the defendants themselves thought Revlon was insolvent at the time, and then all of a sudden miraculously gets a billion dollars, when you factor in the fact that they get it three years earlier and paid it 100 cents on the dollar when the loan is trading at 20 to 30 cents on the dollar, all of these red flags should have led them to ask the simple question, and this is what all the amici say, like the law and economics professors read, like pick up the phone, call Citi, and ask any one of a million questions that would have led to discovery of the mistake. They could have asked, you know, where's the prepayment notice? You know, why is there a discrepancy with the calculation statements? What do your books say? What are you intending to pay here? How can you pay this? What's the source of funds? Any one of these questions would have avoided all of this litigation. It's the simplest thing to do, to use your colleague Judge Calabresi's phrase, they would be the cheapest cost avoider in this situation. But again, I think— As to the 20, 30 cents on the dollar, your point is why would they pay in full the indebtedness when they could retire a bunch of it by buying it? Exactly, Judge LaValle. And indeed, right before it, Revlon had issued a 10-Q and made an exchange offer in which they said, look, we are out of liquidity. This goes—our library goes into detail about this. We don't have much cash, so we've got to buy some notes back and buy them back really on the cheap. If they publicly held that out to the markets and then all of a sudden secretly had a billion-dollar stash fund or something, that would have been securities fraud. Is there anything in the record explaining why the creditor's lawsuit was filed the next day? The timing is odd. I think I would just look to what the lawsuit itself says. So in paragraphs 171, it says this debt is owed to us and Revlon is making it so that it won't get paid, that they're acting propagately and so on. And so that's why the lawsuit was filed. And we think that's extra evidence. It's not our central argument, but we do think that's extra evidence. And when you think, going back to Judge LaValle's first question, is this like bank worms? These folks didn't have the same expectations of finality in the money that came in when that mistaken wire happened. I mean, six of the ten didn't even know that they got the money until after Revlon, after Citi called and said, hey, we made a mistake. And with respect to the other four, there's all this kind of evidence about, hey, what is this? You know, this seems suspicious and the like. And our point to you on inquiry notice is when you've got all of these different red flags, a simple phone call would have solved all of this litigation. Yes, Judge LaValle, you could certify that, but we think this is not a difficult case on the legal question, did these folks act objectively reasonably when faced with these six red flags? And the— Your argument just now made reference to the previously filed 10-K and you referred to securities fraud. So a question that occurs to me is if in these few days Ronald Perlman or somebody else had provided Revlon with a billion-dollar, close to a billion-dollar facility for the repayment of this loan, would Revlon have been compelled under federal securities laws to make disclosure of that provision of the facility? We do think ultimately they would be required to make that disclosure. And, you know, the point about Perlman, our central point to you, is that's the kind of speculation that can't be objectively reasonable. I mean, for example, you know, Ron Perlman is a sophisticated investor. The idea that he's worried about this lawsuit, which hadn't even been filed, and he decides to pay it 100 cents on the dollar without even seeking a release, as the law and economics professors point out, that is wildly, wildly implausible. Again, inquiry notice solves that because all they had to do was pick up the phone, call Citi, call Revlon, and ask any of the bazillion questions, and you would have done that. Here all they did was call each other and call outside counsel. That isn't the kind of reasonable investigation that is calculated to figure out what is going on. And we certainly don't think you have to, like, get to the bottom of everything. That isn't our argument. But you've got to make the simple phone call, and that's what. I have a question about your second argument. It seems like under your rule, if I understand it right, a payment wouldn't be resolved until the account is credited. And I guess my question is, wouldn't that be case-by-case in order to apply the discharge of value defense? In other words, each defendant would depend on how they handled the accounting, whether Citi was entitled to get its money back or not. Is that right? So, Judge Park, we do agree it's a bit case-by-case. Our test is whether or not the defendant has credited the debtor in the usual practice of business, the way they ordinarily do. And that's important because there's all sorts of different loans, construction loans, auto loans, credit cards, all with different types of ordinary courses of business. Here, this is the most important point, that ordinary course of business is specified by the contract itself. It's Joint Appendix page 1127, and it's 2.8b of the contract. And it says, each, quote, each lender shall maintain in accordance with its usual practice an account evincing indebtedness of the borrower, including the amounts of principal and interest. And so if you did that, which is not hard to meet, you meet discharge for a value. You've done that. You've provided the value. And to be sure, what that ordinary business practice is will vary from case to case. But here it wasn't complied with. These folks, first of all, six of them didn't even know they had the money. The four that did. Sure, that's a factual question. But if some of the creditors, I guess my question is, if some of the creditors had been very quick and they had credited the account, that would have been theirs. And the others who didn't find out until the next day wouldn't. Exactly right, Judge Park. The whole point behind the discharge for a value defense is to make sure that you are doing what you're doing in the ordinary course of business. That is the language from Bank Worms itself. It goes back all the way to NASA Bank in 1899. There's no debate. Here what these folks did was not in compliance with the language of that agreement. Indeed, they took the cash and segregated it. They didn't treat it the way they ordinarily treat money coming in. So this was a kind of studied conclusion about what they did, not their usual course of business. All of these different arguments I know sound a little bit technical, but the whole reason behind them is because restitution is the general rule. Discharge for a value is the exception. It's an affirmative defense. All of these are done to rein in the contours of the defense, and that's why despite $5.4 trillion of wires every day and hundreds of thousands, millions of transactions, you don't have a case like this. There is no case that says this is what the law should be, that they get to keep the money, even though everyone is highly incentivized as a litigant to make exactly the arguments that my friend is making here in any of those wires and any of those mistakes. Are there no further questions? Thank you. You reserve three minutes for rebuttal. Ms. Sullivan will give you extra time as well. Thank you, Judge Park. Good morning, Your Honors. May it please the Court. Kathleen Sullivan for the Defendant Appellees. There is no need to certify here because the policy questions were definitively answered already by the New York Court of Appeals in bank firms, and this case is controlled by those policy considerations, and those were two, as the Court of Appeals emphasized and this Court reiterated in affirming Judge Patterson's district court opinion after the certification. Number one, finality in wire transactions, finality so that the recipient does not have to wonder whether funds received from a third party in discharge of a debt to a bona fide creditor should not have to wonder. Finality in bank transactions, and Citibank here would like to engraft new exceptions, new elements into New York law not covered by bank firms that would upset that policy of finality. Number two, Your Honor, and this is crucial here, bank firms said the onus of responsibility where there has been a mistaken transfer by a third party to a bona fide creditor in discharge of a debt, where there is a mistaken transfer, the onus of avoiding the mistake is on the transferor here, Citibank, and not the transferee. And, Your Honor, those two policies were applied faithfully by the district court here, and I'd like to remind us that we're on review from a bench trial here, a 101-page decision by Judge Furman after a one-week bench trial with multiple fact witnesses and two expert witnesses. And so my friend on the other side should not be heard to relitigate fact findings that were already made by the district court, and I think that's important. Let me take the arguments in honor, Your Honor. Judge LaValle listed the four issues. Here, let's start with my friend's attempt to impose a new due date requirement or present entitlement requirement onto bank worms. Bank worms did not impose a due date element. The language was simply that as a creditor of Spedley, the debtor there, bank worms was entitled to the funds. Entitled meaning... Oh, counsel, in bank worms, the date was, you know, I can't remember, April something, 10, and then, like, within the hour, the mistaken payment came in. So the timing wasn't... It didn't seem to be an issue at all. There was no question about whether it was due or not. So the language of the timing in bank worms doesn't seem applicable here. Your Honor, bank worms is exactly like this case. The money comes in, it's mistaken. Bank worms doesn't know that it's been paid the money until two hours later. But bank worms knows that it was due and payable. It called the debt, Your Honor. So it was called in that case, but that doesn't matter here, and I'd like to address prepayment because we are in a world of prepayment here. The testimony was uniform, and my friend conceded that prepayment is the norm in syndicated loan businesses. And so what my friend's due date requirement would do is carve a prepayment exception into bank worms and say, oh, well, if you get your money mistakenly on the date it's due, then discharge for value rule applies. But if you get it a day before, it doesn't. That would be absurd. It would undercut the policy of finality, the policy of certainty the recipient must have about the receipt of funds. What is your basis for saying prepayment is the norm? Your Honor, it's a finding of fact. I understand that prepayment occurs with some frequency, but you say that in syndicated loans what is expected is prepayment? What's the basis? That sounds very surprising to me. Your Honor, first, as we agree, obviously the contract at Section 2.11a of Joint Appendix 1263 permits optional prepayment. But the testimony was uniform, and let me cite, Your Honor, particularly to the testimony of Percal at 781. The vast majority get prepaid well prior to the maturity. The testimony of Crocombe at Joint Appendix 818-19, the vast majority of them are paid down on a prepayment basis aside from maturity. Well, aside from, you know, how common it is, there's a procedure that's set on the contract for how that's done. And even if that was intentional here, it seems like that wasn't complied with. No, Your Honor. Let's break the procedure into two parts. Revlon has to give Citibank three days' notice of prepayment. Citibank only needs to give the creditors prompt notice that it's prepaying. And, Your Honor, it was expressly found, and let me commend the Court's attention to the findings of the district court. The district court found that payment notices come in sometimes late, sometimes not at all, and sometimes split between interest and principal repayment. That testimony is reviewed at the special appendix at pages 82 to 83. Moreover, Your Honor, Citibank's own witness, Mr. Titschauer, the author of the agreement, admitted that he didn't know what prompt meant. I commend the Court's attention to Joint Appendix 302 and 305 where Mr. Titschauer says, I don't know what prompt meant. So, Your Honor, those two. Without prompt, the three-day Revlon notice wasn't given here. And so could the creditors have waived that? I don't know if that, you know, since it didn't happen, what's the situation we're in? Your Honor, there's no, the question, from the lender's point of view, what Revlon told Citibank is invisible. The Revlon, and from the lender's point of view, the findings of fact by the district court are that notices come in haphazardly, late, sometimes not at all, sometimes after the fact, sometimes split between interest and payment and principal. In fact, Judge Ferman said, I'm astonished to find how haphazard the notice practice is. The custom and practice of the industry is notices do not come in. So, Your Honor, on this record, you could not find, I believe, that there was any clear error in saying that the lack of a principal prepayment notice by Citibank to the lenders is a factor in Citibank's favor. Let me turn the tables around. Let's look at the things that Judge Ferman did find gave rise to his conclusion that the lenders and my clients, the managers who were their agents, reasonably believed this was an intentional prepayment and not a mistaken transfer. And let me just review the evidence. These are factual findings that this court would have to overturn for clear error in order to find that there was some kind of notice of mistaken payment here. Number one, we've already discussed, prepayment were common in the industry. And, Your Honor, I've commended you to the testimony of Perkle and Crocombe. But they also said it's also done by insolvent debtors. The testimony of the managers was insolvent debtors just because you're insolvent doesn't mean you can't pay your debts. It means you can't pay all your debts at the same time. And there was specific evidence at JA 784 from Mr. Perkle and JA 818-19 by Mr. Crocombe that insolvent borrowers, often like Mr. Perkle, have reasons to prepay debt. It gives the equity holders more control. It dispels going concern problems. That testimony is in the record. First reason why it was reasonable to suppose this was an intentional prepayment and not a mistaken transfer was prepayment was common even for insolvent debtors. Number two, and here I commend the Court's attention to the special appendix at page 65 to 66. Every one of the 10 manager witnesses who testified to a person said that they believed, reasonably based on their experience, that this was an intentional prepayment. Now, my friend is going to say, well, that's their subjective belief. But when 10 managers, every one of the fact witnesses in the case, say there was reason to believe it was an intentional prepayment, you would have to say that all 10 of them were unreasonable in so believing to overturn that factual finding. Number three. Could you address your adversary's argument that that would have been an irrational thing to do given the solvency status of Revlon and I guess there's the litigation the next day that was filed. It just seems odd that the full prepayment would have come in when it did. Yes, Your Honor. Let me do them in reverse. So as to the litigation the next day, the district court specifically found at special appendix pages 91 to 93, says, yeah, that's not a good look. Litigation was filed the next day. But he specifically said that does not negate his inference that the lenders on August 11th when they received the funds reasonably believed this was an intentional prepayment. And here's why. The litigation had been set in motion long before. It would have been like turning around a great big ocean liner to stop it. The district court specifically said that there was no evidence in the record whatsoever that anybody who filed the lawsuit had any knowledge of the payments. And, Your Honor, what the district court held there is that, if anything, the filing of the lawsuit enhanced the reasonable inference that it was an intentional prepayment. Why? Because if the lenders are about to sue the borrower, no borrower wants that. It could have forced Revlon into bankruptcy. You might want to prepay the 2016 term loan to avoid that possible result. And the district court expressly found at 91 to 93 that there were reasonable inferences by some lenders that maybe the prepayment was a way of trying to keep the lenders at bay from suing. Now, Your Honor, it's really just a red herring, the hexagon of timing about the lawsuit. But the district court found, and again, these are factual findings subject to clear error review, that this supported the inference. As to the UMB lawsuit is not grounds to doubt the prepayment. And I want to get to one other very important point, which we haven't focused on. My friend says, well, Ron Perelman may be a multi-billionaire, but what makes you think he was prepaying this? And you ask, well, wasn't it odd that they would have prepaid 2016 when there was this other activity about the 2021 loans? To the contrary, it was exactly, exactly because Ron Perelman and McGendron Forbes had previously prepaid term loans and other notes, including for cash, including at par, and in all cases prior to maturity. It's precisely because there had been the May 2020 example, which discharged debts, including almost a billion dollars worth of debts. It's precisely because of that that it was reasonable to suppose that this was an intentional prepayment. So the history of prepayment, this is in the record, Your Honor. Mr. Perkle describes this at Joint Appendix 782. And don't take it from the managers. Take it from Revlon. Revlon's own treasurer, Mr. Warren, at page Joint Appendix 859, mentions that Revlon had received a billion dollar facility from Perelman to do this. Wouldn't it have been required to disclose that? Well, Your Honor, two issues there. Back in May 20, the repayment had the effect of forcing an amendment of the credit agreement. So the lenders were on notice of the change in the credit agreement because we are all lenders. My clients' clients were all lenders on the 2016 facility. Second, Your Honor, the securities law issue. Securities law just requires that you give notice within five days of a material event. So the securities law argument is a bit of a canard here because we're talking about events over a 122-hour period. So the existence of a securities-based notice is really not relevant here. But Your Honor, the facility back in May 2020 is different. The current prepayment was just a normal prepayment. And let me, just to tick off the last factor, Your Honor, I've talked so far about what the district court found, as a matter of fact. All 10 manager witnesses uniformly testified they believed it was an intentional prepayment. Prepaid payments were common in the industry even for insolvent companies. The calculation statements themselves, and here you have an illustration of one appended to the district court opinion at Joint Appendix 103 to 104. The calculation statement said interest due. And the district court found significant that interest could be due on August 11th when interest is otherwise paid at the end of the month. Now, an off-schedule interest payment could be due only if there was a prepayment of principal. And last, Your Honor, there are the admissions on the other side of the ledger by city's own witnesses that no bank prior to this had ever mistakenly paid the entire amount of principal and accrued interest to the penny. Again, don't take it from the managers. Take it from city's own witnesses. Mr. Frada, 673 and 684 of the Joint Appendix. No, I've never seen it before. Mr. Farrell, Joint Appendix 646. No, I've never seen this before. Mr. Warren, Revlon's treasurer, JA 865. No, I've never seen this before. So what the district court found is that comparatively, as between thinking that it was an intentional prepayment, which is common in the industry, which Perelman and Revlon had done before as recently as three months prior, and where the confirmation payments were consistent with intent, sorry, the calculation statements were consistent with prepayment because they said the interest was due. Put that along one side. On the other side, black swan event. The proverbial black swan event, says the district court at Special Appendix 69. The comparative likelihood that Citibank, one of the most sophisticated financial institutions in the world, made an unprecedented black swan mistake and mistakenly paid to the penny all principal and accrued interest. Compare that hypothesis with the hypothesis of, oh, Perelman did it again. He pulled a rabbit out of the hat to cite manager Mr. Langen's testimony. They'd seen it before. They were embroiled in litigation where they thought maybe this was a litigation tactic. The district court concluded, as a matter of fact, there was no notice that this was more likely to be a mistaken transfer than an intentional prepayment. In fact, I commend the court's attention to two lines in the district court's opinion, where the district court says at Special Appendix 68, it would have been unreasonable to think this was an unprecedented mistake by a sophisticated bank like Citibank. It would have been, at Special Appendix 100, borderline irrational. So Your Honor, to just close on this, it's a bench trial where the district court repeatedly said I read it. Let's assume, just for a second, let's assume that the extremely able trial judge made no findings that were clearly wrong. If that's so, is the result of this case compelled by bank worms? Yes, Your Honor. We do. We think it is compelled by bank worms, because you would have to rewrite New York law to impose the two new legal requirements that my friend wants to impose. Bank worms did not impose a due date or present entitlement requirement. It imposed an entitlement requirement. The modifier present. What New York law would we have to rewrite? Bank worms didn't raise the issue of timing,  Your Honor, you would have to ignore the policy and the reasoning of bank worms, which says onus of mistakes lies with the bank, not with the innocent recipient, and the policy that favors finality in transfers. Your Honor, I'd also commend the court's attention to what bank worms did. It adopted. That's quite different from rewriting the law. Well, Your Honor, it rewrites the law to add a new element. Bank worms said three elements, exhaustive. One, bona fide creditor. Two, no misrepresentation by the creditor. Three, no notice of the mistake. Did it say how notice should be interpreted? It did not, Your Honor. So we wouldn't be rewriting the law. We would be enforcing the law as written by bank worms if we said, in this case, there was a category of notice. I just don't see your argument that it would be rewriting the law because it would be contravening what your argument is as to what was the motivational justification for the decision. Your Honor, let me take notice separately. You don't need to certify on notice because, as I've just explained in too much detail, I'm sure, there was a finding that under any notice standard, there was no reason, A, to know or, B, to suspect that this was a mistake rather than an intentional prepayment. But because the district court, as a matter of fact, found no red flags under either should have known or reason to suspect knowledge, there is no legal question to certify to the court. Whatever New York Court of Appeals could possibly choose as between the flavors of constructive notice, there is no reason to certify here on this factual record because either way, open, take the box, take the curtain, either flavor of constructive notice, there was no notice here. This was a textbook case where here, as in Bank Worms, Bank Worms didn't know that the funds had gotten into its account, Judge Parr. Two hours later, its transferee bank, its agent, says, oh, I'm sorry, I double paid. Give me the money back. And Bank Worms, finding out simultaneously that it had just been credited with the money and it wanted to be reclaimed, said no. So this is just like Bank Worms. There's no need to certify the notice question. It's an interesting academic question, whether there should be inquiry notice. We think inquiry notice is actually inconsistent with Bank Worms' policy, which is make sure the recipient, in the words of the Court of Appeals Judge Alexander, don't have to wonder. The recipient shouldn't have to wonder. But you don't have to resolve that here because on the factual record. On that issue, Bank Worms did not say all wire transfers. This covers all wire transfers. Under Bank Worms, it covered a rather limited category of wire transfers, which are the ones within the framework of the decision. Other wire transfers are not subject to that decision. So the question is, it's a policy question, exactly how far does the New York Court of Appeals want to go in reinforcing the reliability of wire transfers? Your Honor, all wire transfers where three elements are met. All wire transfers are what? All wire transfers. Discharge for value rule applies, incorporating section 14.1 of the original restatement of restitution by Seavey and Scott. That requirement is simply, number one, a bona fide predator, no dispute we are. Our lenders were, our clients were. Number two, no misrepresentation by the transferring non-peer and no notice. My point is that the Court of Appeals did not say in its justification or in its rule, our rule applies to all wire transfers. We don't want anybody to have to question wire transfers. This rule is applicable to a limited category. So then there are open questions about exactly how limited is that category. And in back warrants, it was a payment that was due and payable. Your Honor, with respect, I must disagree. The New York Court of Appeals couldn't be clearer that it was trying to resolve a general policy question for the New York banking industry. It says that this court, after the certification, interprets the New York Court of Appeals as follows. This court said, the conclusion was supported by our recognition that the decision to certify that our holding in the present case will undoubtedly have a significant impact on banks and financial institutions operating in New York State and have serious repercussions for New York's banking community. So I think that this court in accepting the New York Court of Appeals decision and making its facile application to the facts in bank warrants was trying to make a general rule. But I want to get to the last point, Your Honor. You asked me how would you be rewriting New York law. I said as to notice, don't certify, because it all turns on factual findings that weren't clearly erroneous. So there's nothing to certify. On due date and the booking requirement, my friend wants to engraft onto New York law two new elements. It has to be due on the date. Well, the illustrations and restatement... I'm sorry, going back to the point you just made. The factual findings were what happened, what certain people thought, et cetera. The legal question is do those factual findings satisfy the standard of inquiry notice? That's a legal question, not a question on which a district court makes a factual finding that can only be reversed for clear error. I, of course, agree, Your Honor. That's absolutely correct. But where the district court finds that under either of the two possible legal standards, there was no notice, there's no legal question for you to certify. The legal question would, in a sense, be irrelevant or beside the point, given that the factual findings are that under either standard, there was no notice. If I could just be indulged one more minute, Your Honor. Of course. I just want to address my friend's second argument. I've noted that you should not change New York law by adopting a new due date requirement that would, in effect, carve a prepayment exception out of bank verms that would decimate any industry that, like the syndicated loan industry, involves prepayment. But you also should not rewrite New York law to adopt the booking requirement. You have to book the loan, whatever that means. Citibank changed its position multiple times on what booking meant, especially after it found out that its own register had credited the paydown. Can I ask you about your position on that? Yes. Has that, for discharge of value, there has to be some value given? And I'm wondering, has that been discharged by the creditors? Well, Your Honor, the TRO has prevented the bookkeeping. It's rather rich for my friend to say, oh, well, they've segregated the funds. There's a temporary restraining order and there's a pending motion before this Court. And I would just ask, if you do certify, Your Honors, please deny the motion for a stay pending appellate resolution so that our money isn't tied up for two more years if it goes up to Albany and back. At least decide the motion in our favor if you do certify. But, Your Honor, as to the booking, the so-called bookkeeping... Just to be clear, I'm sorry to just interrupt you, but to follow up on that then. So the discharge for value, there hasn't actually been a discharge? Yes, Your Honor, yes, there has under New York law. There has been a discharge for value because New York law, and we cite in the brief, at the red brief, page 31, we cite all the New York sources. I commend the Court's attention, especially to the venerable case of McRae against Vermoort, 1836, in which the New York Court of Appeals said, the payment of money discharges a debt. The receipt is merely evidence that the debt has been paid. So your theory is when the money hit, then it was discharged. That's exactly right, Your Honor. And we think that New York law... We actually think Bank Worms decided that. All three courts in Bank Worms referred to time of payment, not subsequent time of booking, whatever that may mean. The New York Court of Appeals opinion said, no detrimental reliance requirement. The recipient doesn't have to do anything affirmative, like book the payment, in order to claim discharge for value. Judge Patterson in the district court expressly rejected the bookkeeping requirement that was urged on him, citing this Court's decision in Durbrick. He said, no, funds come in, then there's notice of the mistake, then they're booked at the end of the day under then-extant clearinghouse rules. Judge Patterson, no, no bookkeeping requirement, and this Court affirmed. Well, I would agree with you that I think that the booking issue is the weakest of Citibank's arguments. Well, thank you, Your Honor. Then I don't need to belabor it other than to add that it would be hopelessly unworkable, for the reasons Judge Park explored in colloquy earlier with my friend. All the different actors in this scene, the lenders, the bank administrators, the investment managers, the custodians, the district court expressly found that they all had different booking requirements. This is at Special Appendix, pages 53 to 54. So there's a hopeless confusion as a practical matter. I think it's pretty clear that the lenders couldn't say, we keep the money, but Revlon still owes us the money. We got this payment, unexplained payment, and we get to keep it, but we still get to collect the debt. Exactly, Your Honor. And the district court said just as much in the argument at trial, and that's exactly right. It would be absurd to adopt a booking requirement that says, oh, we can get the money, not book it, and sue you again to pay us again. That would be absurd. So, Your Honor, in conclusion, we do not think you should certify because it would be rewriting New York law to send it up to Albany to ask whether you should add two new exceptions to bankworms, the due date requirement and the booking requirement, which has absurd consequences. Restatement III of Restitution and Unjust Enrichment at Section 67, Comment 8, says that a booking requirement would be arbitrary, difficult to verify, and subject to manipulation. But finally, Your Honor, one more reason not to certify. This Court does not send the case to Albany when it will not recur. The banks have touted, supported by their amici, that exactly what was supposed to happen in bankworms has happened here. They're correcting their internal controls so that their agents will remember to check the box next time and not send principal out when they meant to send interest. That's exactly... You're saying there will be no more cases of mistaken wire transfers? No, Your Honor. Mistaken wire transfers happen all the time with fat finger mistakes, and here's why the notice requirement takes care of them. When the district court adopted a constructive notice requirement, we have not pressed an argument for actual notice here. You can adopt that, and it takes care of fat finger mistakes. When there's double payments, payments from the wrong party to the wrong party, when a 10-digit account number is mistaken for an amount, when people are paid twice for the same thing, all of those fat finger mistakes are ones that will be self-evident at the moment of receipt. You look at it, you say, why did I get paid twice? Why was there an extra zero? Why did it come from the housing authority rather than the person I thought I sold the watches to? Those constructive notice takes care of fat finger mistakes. It's worked for 30 years, because when there's an obvious fat finger mistake, the money gets returned. But here where there's a once-in-a-lifetime event, which city's own witnesses said they would not have known this was an error, they admitted it. Mr. Frata and Mr. Titschauer at the Joint Appendix 680, 681, 307, and 308 said it's not an obvious mistake. It wouldn't have been to us. If city's own witnesses says this wouldn't be an obvious mistake, there was no notice, bank rooms, controls, this Court should affirm and it should not certify. But respectfully, if you do certify, please deny the motion for a State pending appeal. Thank you, Your Honor. Roberts. Thank you, counsel. Mr. Katyal, you have three minutes reserved for rebuttal. Katyal. Thank you, Your Honor. Three points, and these are legal, not factual arguments. The only factual argument is not we're not pushing that. It's not even issue three. It's about objective reasonableness. So our first point is they can't cite a case because there isn't one. As the amici say, cases don't arise because people give the money back and the district court's ruling will destabilize the financial industry. And my friend said bank rooms is, quote, exactly like this case. That's a massive over claim. As Judicial Value said, it doesn't even apply to all wire transfers. Indeed, the language in bank rooms says, quote, in these circumstances. And one of those circumstances was, of course, is entitled. That's at page 196. And there in bank rooms, unwinding the transaction would restore all part of what would penalize someone who is owed that money right then, whereas here, unwinding the transaction puts them exactly in the place that they were under their agreement. Now, that's not a prepayment exception or anything like that. Judge Park, you're absolutely right. There's a procedure for dealing with prepayment. That wasn't complied with. Now, if it is complied with, absolutely. We think in that circumstance the expectations of finality, all the wonder language from bank rooms, all of that makes sense because you've got that irrevocable notice. In the absence of that, you don't have those expectations of finality. Now, she says, well, prompt means something else. Well, whatever prompt may mean, it can't mean that you give the notice after the money comes in. That would defeat the whole purpose of this bargain for language in the contract itself. And indeed, the evidence in this— I'm not sure. It seems to me you're going a little bit farther than seems reasonable to me. I was inclined to think more in terms of in this kind of circumstance, can promptly be satisfied by waiting more than three days. If Citibank were required to receive the notice three hours before and Citibank was required to promptly notify the lenders, it might come out quite differently. I don't think I'm going to fight you on that. All I'm saying is when you've got something that says prompt and all of this money comes in under that agreement, then you have the kind of expectations of the finality from a prepayment. When the money comes in outside of the terms of the agreement, when it's not prompt, when there isn't three days' notice, it's hard to say that these defendants were like the ones in bank forums, expecting the money on that day. And the evidence at the trial on this, at Joint Appendix page 476, is very good. It says when there are documents that are missing, when money comes in unexpectedly, we pick up and ask the—excuse me, that's from a defendant. One of the defendants themselves said, we, our regular practice is to go and figure out what is going on. Now, my friend said, well, this is a to-the-penny mistake, which makes it different. Well, first of all, the evidence at trial, Joint Appendix 935 and 936, said there are many to-the-penny mistakes, many shrouded by anonymity, but they exist. And the Clark brief at page 7 is very telling on this. It says to-the-penny mistakes in this digital age of drop-down menus and check-the-boxes like what happened here are common and likely to recur. And indeed, a to-the-penny mistake here cuts the other way because this loan was trading at 20 to 30 cents on the dollar on the open market. If it's paid to the penny, then you'd have to ask what in the world is going on. Again, do they have the kind of expectations of finality like in bank forms? And I think the answer to that is no. Now, the second point I'd make is my friend spent a lot of time giving you a lot of evidence about the subjective motivations and all sorts of stuff of the defendants. That's not what we are saying. We're saying that objectively anyone in this situation would have picked up the phone and asked. The ABA brief at page 23 is very, very telling on this. They surveyed all the different banks and said, what would you do? And they said, in this circumstance, we would ask the question. We wouldn't do what the defendants did here. And just because there are some times when Perlman has paid money or an insolvent organization has been able to pay their debt, nothing to the tune of a billion dollars when the loan is trading at 20 cents on the dollar and it's paid in full at 100 cents on the dollar. That's a massive red flag. It would encourage someone to pick up the phone and call. Now, Judge LaValle, you said our second argument is weak about for a value. I just want to say to you, if you accept their argument, for a value is read out. There's only three words in the name of this, discharge for a value. What they would do is make it the moment of transfer, nothing else. That is, you know, there isn't a case that does that. The Sixth Circuit and Calumet said the value is the discharge of the loan. The value is the discharge of the loan. And if you do it that way, then you've collapsed it down to essentially just the transfer. Now, if they did discharge it, if they did anything to reflect the credit, that would be one thing. This isn't a bookkeeping rule. As I said to you, this is a contractual compliance rule. The contract itself requires this kind of bookkeeping. And so if you want to get the benefit, like a bona fide purchaser, you've got to do what the contract requires in order to do so. You've got to provide the value. Ms. Sullivan says under New York law, the loan was discharged the minute the money was received. Yes, and our point to you is that under New York law, you have to, for the discharge of value defense, it turns on what is the ordinary practice of business. That isn't defined by some abstract case. It's defined by the terms of the agreement itself. And the agreement itself here says you've got to have the kind of bookkeeping and discharge of the debt. So that's our point to you on number two. I have a little bit of a problem with your argument. Does it imply that the lender could say, we haven't entered the credit against your account, so you still have to pay us to discharge the debt? Well, I think what it says, Judge LaValle, is as long as you've done anything to provide the credit, then you look more like a bona fide purchaser, what the discharge for value defense is. Here, instead of that, they sued us, saying that the debt still exists. They kept taking interest payments, and they didn't do anything whatsoever to reflect and tell Revlon, hey, your debt's discharged. There was nothing whatsoever before our point to that, before we made the notice of the mistake to all 10 defendants. Indeed, six of them didn't even know, Your Honor, that the money had come in, only once we had told them about the mistake. So if you accept your— Aren't we just talking about what needed to be done before notice was received? Correct. Isn't that the only issue? Correct, correct. Absolutely. So, I mean, once Citibank calls and says that was a mistake, then I would understand the debtor not crediting the lender on its books, not creating a document saying that your debt has been paid, while Citibank and the lender are claiming you have to give back what you already received. In Judge LaValle, our argument is just like Calumet. In that period before the notice of the mistake was given by Citi, they have to follow ordinary business practices. They didn't do that at all. And, you know, that's important for Revlon to know that their debt has been discharged and things like that. The last thing I want to say to you is about certification and its intersection with the stay. You have briefs before you that we filed on May 19th and June 8th that say that the stay should be maintained, that the status quo should be maintained. We want what every litigant—what every appellant wants, which is if we win this case, to have a meaningful shot at recovery at the end of it. And if—for the reasons our brief explains, under their indenture agreements, all of that would be a problem because it creates a strict payment schedule designed to exhaust virtually all the cash that these CLOs, these specialized vehicles, get. Indeed, the whole point of these specialized vehicles is to give the money only to investors. And so under the terms of their agreement, if you did release the money now, we may never get that money back. And that's why we sought the stay. And that's why if you did decide to certify or even if you didn't, we think pending the appeal, pending this decision, you should keep the status quo in place, which has been in place for a while. They never expected this money until 2023 anyway. That's the terms of the agreement they signed. They want now a windfall. They want the money now, years ahead of time, when that wasn't the bargain that they agreed to in the contract that they signed. I'm sorry. What is the order you're referring to that maintains the status quo at present? Yeah, so it's Judge Furman. Judge Furman has maintained a stay pending the determination of what you all do on it. And you have briefing before you in May and June of this year, highly expedited briefing, as to whether the stay should be maintained pending your decision on the merits. Give me the citation to that particular order. So I don't know the citation to Judge Furman's order. I could probably get it for you. But we filed briefs on May 19th and June 8th. Didn't you say that this court? We filed it before this court. Has this court entered a stay? We do. We're asking you to continue the status quo. You don't have to. No, no, no, no, no. Have we already entered a stay pending this appeal? Right. You have not. So Judge Furman said he will keep the stay in place. Pending what? Pending your decision on the case. So if Judge Furman has entered an order staying any disposition of these funds pending our decision, then that order remains in effect until this court makes a judgment in this case. That's the way I read it. And my friend, Ms. Sullivan, has said it's at Joint Dependents, page 1369, that order. And so we're just saying, you know, I think, you know, you could take a look at it. You could read it to say that stay is only in effect pending your decision on the stay. Judge Furman might be saying that. So you may say that it requires some order by the Second Circuit. And if so, we would say just keep the status quo in place. Maintain the stay that's always been around from the start. Don't give them the money because they've said that they will disperse it to the CLOs, and then we may never get it back. Thank you both. We'll take the case under advisement. The last case on the calendar for today, United States v. Mustafa, is on submission. So that concludes arguments for today. I'll ask the courtroom deputy to adjourn. Court stands adjourned.